**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JENNY L. ADAMS | ) | CASE NO. 1:21-CV-02199-PAB |
| | ) | |
| Plaintiff, | ) | JUDGE PAMELA A. BARKER |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY, | ) | JENNIFER DOWDELL |
| | ) | ARMSTRONG |
| Defendant. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.   INTRODUCTION

Plaintiff Jenny Adams ("Adams") seeks judicial review of the final decision of the Commissioner of Social Security denying her applications for Disability Insurance Benefits ("DIB") and Period of Disability ("POD"). This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). (*See* ECF non-document entry dated 09/02/2022). For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's decision.

## II.   PROCEDURAL HISTORY

On August 15, 2019, Adams filed applications for DIB and POD, alleging a disability onset date of June 5, 2019. (ECF Doc. No. 7, Exhibit 1D, PageID # 195). Adams's applications related to her back pain, neck pain, and stage two breast cancer. (*See* ECF Doc. No. 7, Exhibit 2E, PageID # 234). The Social Security Administration ("SSA") denied Adams's applications initially and upon reconsideration, and Adams requested a hearing before an administrative law judge ("ALJ"). (ECF Doc. No. 7, Exhibit 3B, PageID # 134; *id.* at Exhibit 5B, PageID # 142; *id.* at Exhibit 6B, PageID # 147). On September 4, 2020, an ALJ held a hearing via telephone during which Adams,

1

represented by counsel, and an impartial vocational expert ("VE") testified. (ECF Doc. No. 7, PageID # 64-104). On November 4, 2020, the ALJ issued a written decision finding that Adams is not disabled. (*Id.* at PageID # 45-59). The ALJ's decision became final on October 18, 2021, when the Appeals Council declined further review. (*Id.* at PageID # 34).

On November 18, 2021, Adams filed her Complaint to challenge the Commissioner's final decision. (ECF Doc. No. 1). The parties have completed briefing in this case. (ECF Doc. Nos. 9, 11, and 14). Adams asserts the following assignment of error:

> THE ALJ ERRED AT STEP FOUR (4) BY CREATING AN RFC THAT IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE.

(ECF Doc. No. 9, PageID # 1301).

## III.    BACKGROUND

### A.    <u>Personal, Educational, and Vocational Experience</u>

Adams was born in June 1969, and she was 50 years old on the alleged onset date. (*See* ECF Doc. No. 7, Exhibit 1D, PageID # 195). Adams earned an associate degree in business, is married, and lives with her husband. (ECF Doc. No. 7, PageID # 71-72). Adams's past relevant work includes positions as customer service representative, a restaurant assistant manager, and an office manager. (*Id.* at PageID # 92-93).

### B.    <u>Relevant Hearing Testimony</u>

#### *1.    Adams's Testimony*

Adams testified that she stopped working in 2019 because she was unable to meet the physical demands of her customer service job at a pool and spa company. (ECF Doc. No. 7, PageID # 73-75). Prior to that job, Adams worked at several restaurants, including Pizza Hut and Tumbleweed, as well as at a doctor's office. (*Id.* at PageID # 75-79). According to Adams, she is unable to work due to pain in her neck and upper back, which makes it difficult for her to lift things. (*Id.* at PageID # 80). Adams testified that she has received various treatments for her neck

and back pain, including ablations, steroid injections, and physical therapy, but she has not had long-term success with any treatments. (*Id.* at PageID # 81-82). Adams also testified that she has "just some small residual effects from . . . breast cancer[,]" including a burning sensation in her right breast and tiredness. (*Id.* at PageID # 82-83). Adams testified that she is unable to take any pain medication, anti-inflammatories, or muscle relaxers because she had gastric bypass surgery, and her stomach "is unable to handle any of those medications[.]" (*Id.* at PageID # 84).

Regarding her daily activities, Adams testified that she reads, prepares meals, takes a one- to two-hour nap, and performs household chores including vacuuming, laundry (though her husband carries the laundry basket for her), and dishes. (*Id.* at PageID # 85-88). Adams also testified that she takes care of her personal needs, including bathing and dressing herself. (*Id.* at PageID # 85). Adams further testified that she uses a neck brace intermittently throughout the day. (*Id.* at PageID # 91).

### 2. *Vocational Expert's Testimony*

The ALJ asked the VE to consider a person with Adams's age, education, and vocational background who was physically and mentally limited in the way in which the ALJ determined Adams to be limited. (ECF Doc. No. 7, PageID # 94, 96). The VE opined that such an individual could perform Adams's past work as an office manager, as well as other light work such as a mail clerk, information clerk, and office helper. (*Id.* at PageID # 96-97).

### C. __Relevant Medical Evidence__

The relevant medical evidence is more fully discussed in the analysis of Adams's assignment of error below. That discussion is limited to the portions of the record cited by the parties in their briefs and/or deemed relevant to the instant case. The most relevant medical evidence related to Adams's arguments are the three opinions of Kevin Hopkins, M.D., and the Key Functional Whole Body Assessment ("Whole Body Assessment"), which I will now

summarize.

### 1.    *Dr. Hopkins*

On February 13, 2020, Dr. Hopkins completed a Physician Residual Functional Capacity Assessment form regarding Adams and her primary diagnosis of spondylosis of the cervical spine. (ECF Doc. No. 7, Exhibit 8F, PageID # 868). In it, Dr. Hopkins checked boxes indicating that Adams could:

- occasionally lift and/or carry ten pounds;
- frequently lift and/or carry less than ten pounds;
- stand and/or walk (with normal breaks) for at least two hours in an eight-hour workday;
- sit (with normal breaks) for less than about six hours in an eight-hour workday; and
- push and/or pull on an unlimited basis, other than as shown for lift and/or carry.

(ECF Doc. No. 7, Exhibit 8F, PageID # 869). Dr. Hopkins based these conclusions on Adams's "constant, chronic neck pain . . . with intermittent pain radiating into left hand." (*Id.*). Dr. Hopkins also checked boxes indicating that Adams had no postural, manipulative (except "limited" reaching in all directions), visual, communicative, or environmental limitations. (*Id.* at PageID # 870-72). Dr. Hopkins also indicated that Adams has "moderate exaggeration of cervical lordosis, upper thoracic hypertrophy, kyphosis, eccentric to the left disc osteophyte complex, uncovertebral hypertrophy, facet arthrosis at C5/C6 level with moderate narrowing of the spinal canal [and] left neural foramen." (*Id.* at PageID # 875).

On February 22, 2020, Dr. Hopkins completed a "Medical Questionnaire" regarding Adams's spondylosis of the cervical spine. (ECF Doc. No. 7, Exhibit 9F, PageID # 879). In it, Dr. Hopkins used check marks to indicate that Adams has nerve root compression and neuro-anatomic distribution of pain in C6, C7, and C8. (*Id.*). Dr. Hopkins also used check marks to indicate that Adams has a limited range of motion in the spine, and has muscle weakness in the left hand. (*Id.*). Dr. Adams further used check marks to indicate that Adams does not have positive signs of motor loss, that she does not have sensory or reflex loss, that she does not need to lie down or recline during

4

the regular work day, and that she does not need an ambulatory device. (*Id.* at PageID # 879-880).

Dr. Hopkins also circled a box indicating that Adams would be off-task more than 15% of the time,

and wrote that Adams was "unable to sit or stand for prolonged periods (>30min) due to pain[,]" and

that the onset date of these limitations was "Jan. 2020[.]" (*Id.* at PageID # 880).

On September 8, 2020, Dr. Hopkins answered questions contained within a letter sent to him

by Adams's counsel. (ECF Doc. No. 7, Exhibit 15F, PageID # 1283). In it, Dr. Hopkins used check

marks to indicate that he reviewed, agreed with, and adopted the results contained in Whole Body

Assessment dated September 4, 2020[1] (addressed in more detail below). (*Id.*). Dr. Hopkins also used

check marks to indicate that, after reviewing the Whole Body Assessment, it is his opinion that

Adams would be unable to perform any full-time occupations, and that the Whole Body Assessment

is an accurate reflection of Adams's limitations from June 2019 through present (*i.e.*, September

2020). (*Id.*). Dr. Hopkins also used check marks to indicate that Adams would be off-task more than

15% of the time, and that she would – on average – miss work at least two days per month. (*Id.* at

PageID # 1283-84). Dr. Hopkins also indicated that: he has been treating Adams for nine years; she

has diagnoses of cervical spondylosis and thoracic spondylosis, among others; and that he answered

the questions Adams's counsel presented to him based upon the "functional assessment performed

9/3/2020 and with reasonable amount of medical certainty." (*Id.*).

      *2.*     ***Whole Body Assessment – September 3, 2020***

On September 3, 2020, Jamie Hart, P.T., A.T., D.P.T. and Michelle Godek, Ph.D., A.T.

conducted a "Key Functional Whole Body Assessment"[2] of Adams. (ECF Doc. No. 7, Exhibit

12F, PageID # 1229). The Whole Body Assessment indicated that Adams could:

- work four to five hours per day;

---

[1] This appears to be a typographical error. The Whole Body Assessment is dated September 3, 2020.

[2] I note that Adams refers to this as the "Whole Body Evaluation[.]" (ECF Doc. No. 9, PageID # 1302). To be consistent with the document itself, I will refer to it as the Whole Body Assessment. (*See* ECF Doc. No. 7, Exhibit 12F, PageID # 1229).

- sit one to two hours with a twenty-minute duration;
- stand one to two hours with a twenty-five minute duration;
- walk for four to five hours with frequent long distances;
- occasionally lift more than fourteen pounds;
- occasionally push and pull around seventy pounds;
- occasionally carry more than fifteen pounds;
- occasionally balance, bend/stoop, climb chairs, crawl, crouch, kneel, and squat;
- frequently grasp with the right hand; and
- occasionally grasp with the left hand.

(*Id.*).

### D.    <u>State Agency Medical Consultants</u>

####    *1.    Maureen Gallagher, D.O.*

At the initial level, Dr. Gallagher reviewed Adams's file on November 11, 2019. (ECF Doc. No. 7, Exhibit 1A, PageID # 105-18). Dr. Gallagher indicated that Adams could perform light work with frequent climbing, stooping, crouching, and crawling. (*Id.* at PageID # 114-17). Dr. Gallagher also indicated that Adams could:

- occasionally lift and/or carry twenty pounds;
- frequently lift and/or carry ten pounds;
- stand and/or walk (with normal breaks) for six hours in an eight-hour workday; and
- sit (with normal breaks) for about six hours in an eight-hour workday.

(*Id.* at PageID # 114).

####    *2.    Mehr Siddiqui, M.D.*

At the reconsideration level, Dr. Siddiqui reviewed Adams's file on February 19, 2020. (ECF Doc. No. 7, Exhibit 4A, PageID # 121-29). Dr. Siddiqui generally agreed with Dr. Gallagher, but indicated that Adams could occasionally (rather than frequently) climb ladders, ropes, or scaffolds. (*Id.* at PageID # 127).

## IV.    THE ALJ'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through June 30, 2024.

2.  The claimant has not engaged in substantial gainful activity since June 5, 2019, the alleged onset date (20 CFR 404.1571 *et seq*.).

3.  The claimant has the following severe impairments: degenerative disc disease of the cervical, thoracic, and lumbar spine; breast cancer; obesity; major depressive disorder; and anxiety disorder (20 CFR 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: She can stand or walk for four hours in an eight hour workday, but must be permitted to alternate between seated and standing positions at intervals of thirty minutes or greater while remaining at the work station and on task. She can occasionally reach overhead with her bilateral upper extremities, and can frequently reach in other directions. She can frequently climb ramps or stairs, but can never climb ladders, ropes, or scaffolds. She can frequently stoop, kneel, crouch, or crawl. She can work in a setting with no more than frequent exposure to poor ventilation or pulmonary irritants such as fumes, odors, dusts, or gases. She must avoid all exposure to workplace hazards such as unprotected heights and moving mechanical parts. She can adapt to no more than frequent changes in the work setting or routine.

6.  The claimant is capable of performing past relevant work as an administrative clerk as generally performed. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.  The claimant has not been under a disability, as defined in the Social Security Act, from June 5, 2019, through the date of this decision (20 CFR 404.1520(f)).

(ECF Doc. No. 7, PageID # 50-59).

## V.  LAW & ANALYSIS

### A.  <u>Standard of Review</u>

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is

supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip* at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original).

### B.   Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the

time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a). A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Consideration of disability claims follows a five-step review process. 20 C.F.R. § 404.1520. First, the claimant must first demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) and 416.920(d). Before considering Step Four, the ALJ must determine the claimant's RFC, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 404.1520(e) and 416.930(e). At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work,

if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g). *See Abbot*, 905 F.2d at 923.

Here, Adams was insured on her alleged disability onset date, June 5, 2019, and remained insured through June 30, 2024, her date last insured. (ECF Doc. No. 7, PageID # 48). Therefore, in order to be entitled to POD and DIB, Adams must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### C.  <u>Analysis</u>

Adams argues that the ALJ's decision is not supported by substantial evidence, warranting reversal. (ECF Doc. No. 9, PageID # 1301). More specifically, Adams argues that the ALJ erred by finding the Whole Body Assessment and the opinions of Dr. Hopkins unpersuasive. (*Id.* at PageID # 1305-09). For the following reasons, I conclude that Adams's arguments lack merit.

#### 1.  *RFC*

Prior to determining whether a claimant can perform her past relevant work at Step Four, an ALJ determines a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. § 404.1520(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity."); 20 C.F.R. § 404.1520(e) ("[W]e will assess and make a finding about your [RFC] based on all the relevant medical and other evidence in your case record[.]"). RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 404.1545(a)(1). Agency regulations direct the ALJ's assessment of a claimant's RFC is to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. SSR 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

## 2.  *Evaluation of Medical Opinions*

Since Adams's claim was filed after March 27, 2017, the SSA's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 404.1520c.

The new regulations provide that the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)."[3] 20 C.F.R. § 404.1520c(a). Instead, the new regulations direct the ALJ to evaluate the persuasiveness of each medical opinion by considering the five following factors: (1) supportability; (2) consistency; (3) relationship with the plaintiff;[4] (4) specialization; and (5) any other factor "that tend[s] to support or contradict a medical opinion or prior administrative medical finding." § 404.1520c(c). Because the regulations consider supportability and consistency the "most important factors," ALJs are obligated to "explain how [they] considered the supportability and consistency factors for a medical source's medical opinions," while they "may, but are not required to, explain how [they] considered" the remaining factors. § 404.1520c(b)(2).

Although these regulations are less demanding than the former rules governing the evaluation of medical source opinions, "they still require that the ALJ provide a coherent explanation of [her] reasoning." *Lester v. Saul*, 2020 WL 8093313 at *14 (N.D. Ohio Dec. 11, 2020), *report and recommendation adopted*, 2021 WL 119287 (N.D. Ohio Jan. 13, 2021). The new regulations "set forth a 'minimum level of articulation' to be provided in determinations and decisions, in order to 'provide sufficient rationale for a reviewing adjudicator or court.'" *Warren*

---

[3] The "treating source rule," which generally required the ALJ to defer to the opinions of treating physicians, was abrogated by 20 C.F.R. § 404.1520c for claims filed on or after March 27, 2017, such as here.

[4] This includes consideration of the length of the treatment relationship, the frequency of examinations, the purpose of the treatment relationship, the extent of the treatment relationship, and the examining relationship. 20 C.F.R. 404.1520(c)(c)(3)(i) through (v).

*I. v. Comm'r of Soc. Sec.*, 2021 WL 860506 at *8 (N.D.N.Y. Mar. 8, 2021) (quoting 82 Fed. Reg. 5844-01 (2017)). An "ALJ's failure . . . to meet these minimum levels of articulation frustrates [the] court's ability to determine whether [the claimant's] disability determination was supported by substantial evidence." *Vaughn v. Comm'r of Soc. Sec.*, 2021 WL 3056108 at *11 (W.D. Tenn. July 20, 2021). *See also Childers v. Kijakazi*, 2022 WL 2706150 at * 5 (E.D. Ky. July 12, 2022) ("When the Court is unable to follow the ALJ's logic, error has occurred."). Yet, an ALJ need not specifically use the terms "supportability" or "consistency" in her analysis. *See Hardy v. Comm'r of Soc. Sec.*, 2021 WL 4059310 at *2 (S.D. Ohio Sept. 7, 2021); *Terry Q. v. Comm'r of Soc. Sec.*, 2022 WL 969560 at * 5 (S.D. Ohio March 31, 2022); *Fowler v. Comm'r of Soc. Sec.*, 2022 WL 3648436 at * 9 (N.D. Ohio Aug. 9, 2022), *report and recommendation adopted by* 2022 WL 3647771 (N.D. Ohio Aug. 24, 2022).

### 3.  *The ALJ's Analysis*

As noted previously, the ALJ determined that Adams has the RFC to perform light work with the exceptions listed above. (ECF Doc. No. 7, PageID # 52). In making this determination, the ALJ indicated that she: (1) "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSR 16-3p[;]" and (2) "also considered the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 CFR 404.1520c." (*Id.*). The ALJ explained the two-step process for evaluating a claimant's symptoms and concluded that Adams's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Adams's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (*Id.* at PageID # 53). The ALJ explained:

The claimant alleged that she was disabled due to a variety of conditions, including breast cancer and back and neck pain (2E/2). She noted that she was 5'4" and 169 pounds (2E/2). She stated that her impairments forced her to stop working (2E/2). She asserted that she could lift only fifteen pounds and she could not lift above her head (4E/6; Testimony). The claimant said she could not sit for long periods (4E/6). She further claimed that she had panic attacks when stressed (4E/7). She testified that she had fatigue and residual burning sensation related to breast cancer and treatment (Testimony). The claimant noted that she took a nap most days and she had incontinence (Testimony).

. . .

The record reflects that the claimant had a history of several conditions predating the alleged onset date in June 2019, including anxiety, asthma, hypertension, and degenerative disc disease (1F). Imaging in 2018 showed degenerative changes of the lower thoracic spine with mild canal stenosis most prominent at T9-12 (1F/317). Additionally, she had mild disc space narrowing at C5-6 with loss of normal motion with flexion and extension (1F/307). Moreover, there were degenerative changes of the lumbar spine most severe at L5-S1 (1F/302).

In June 2019, the claimant had an exam for cervical spine pain radiating into her right hand (1F/64). She had tenderness and painful motion of her cervical spine (1F/65). However, she demonstrated normal reflexes, sensation, and strength (1F/65). The claimant underwent epidural steroid injections and medial branch blocks through the summer (1F/11, 35, 66).

The claimant had an exam in July after she was diagnosed with breast cancer (1F/44). The next month, she underwent lumpectomy and biopsy (1F/24). Thereafter, she began radiation therapy (5F/43). In September, the claimant began attending physical therapy to improve right shoulder motion and pain following cancer treatment (5F/36). Additionally, she received cervical medial branch blocks and radiofrequency ablation into the fall (5F/9, 21, 26). She demonstrated some weakness in right elbow flexion and extension apparently related to her lumpectomy (5F/26). While she had pain in her neck, she had no sensory deficits, normal gait, and intact reflexes (5F/21, 26). Furthermore, she was obese with a body mass index (BMI) of 30.04 (5F/21).

The claimant had to change psychiatric medications due to interaction with Tamoxifen (5F/12). She was well dressed and groomed with cooperative behavior and euthymic mood (5F/15). She demonstrated goal directed thought processes, good eye contact, and good insight and judgment (5F/15).

During a December mental health assessment, the claimant said that she was depressed and anxious (6F/11). She said that she had diminished interest due to severe neck pain and she felt guilt along with decreased concentration since starting radiation (6F/11). On exam, she displayed a depressed mood, but good grooming, appropriate behavior, intact associations, and appropriate judgment (6F/13). Later that month, the claimant had an assessment for continued neck pain (6F/6). She had

tenderness in her neck but no spasms or gait abnormalities (6F/8).

The following month, the claimant reported ongoing diffuse pain in her cervical spine (11F/2). She remained obese with a BMI of 30.90 and she demonstrated tenderness in her cervical spine, but intact strength, sensation, and reflexes (11F/4). In February 2020, the claimant underwent an interspinous ligament injection (11F/31). She had a seizure following the injection (11F/89). She stabilized following the seizure (11F/94). She exhibited normal neurological findings, including intact attention, speech, sensation, reflexes, and strength (11F/99). An EEG and brain MRI were normal (11F/101).

The claimant complained of increasing depression and anxiety in March (11F/243). She reported poor sleep and while she noted increased anxiety, medication controlled her panic feelings (11F/243). Although she appeared tearful and depressed with variable concentration, she exhibited intact memory and she had no suicidal thoughts (11F/245). She received an increased dose of Celexa (11F/223). Additionally, the claimant had well-healed incision with mild post-radiation edema, but was doing well and was to have rehabilitation for the edema (11F/235).

During a March neurological follow-up, the claimant said that she had no further seizures and she was feeling better overall after completing cancer treatment (11F/252). The next month, the claimant had some firmness and swelling in her right breast, for which she as advised to wear a compression bra and perform home therapy (11F/260). Into the summer, the claimant reported urinary incontinence, for which she underwent physical therapy with improved symptoms (13F; 14F). Additionally, updated mammography documented no malignancy (11F).

(*Id.* at PageID # 53-54).

The ALJ then explained her evaluation of the medical opinions and prior administrative medical findings. (*Id.* at PageID # 54-57). In doing so, the ALJ first addressed Dr. Hopkins's findings, explaining:

Kevin Hopkins, M.D. stated that the claimant could lift and carry less than ten pounds, stand and/or walk for at least two hours, and sit for less than six hours in a workday (8F/2). Dr. Hopkins opined that the claimant could frequently crawl and climb ramps or stairs, with no other postural limitations (8F/3). Dr. Hopkins asserted that the claimant had an unspecified limitation reaching in all directions (8F/4). The undersigned finds this opinion unpersuasive. While Dr. Hopkins treated the claimant, neither his records nor the medical records as a whole contain objective findings or testing to support a conclusion that claimant's impairments would limit her to sedentary levels of lifting, standing, or walking. Despite chronic neck pain, she demonstrated largely normal strength, sensation, reflexes and gait, with imagery showing relatively mild impairments, all more consistent with a finding that she could generally perform light work.

14

Dr. Hopkins offered another assessment of the claimant's functioning, indicating that she had nerve root compression, limited motion, muscle weakness, and neuro-anatomic distribution of pain (9F/1). Dr. Hopkins asserted that the claimant would be off task for over fifteen percent of the workday due to breaks and interference with concentration, and unable to sit or stand for more than thirty minutes at a time (9F/2). The undersigned finds such opinion unpersuasive. While lumbar imagery did show a bulging disc with stenosis, the record as a whole documented generally normal gait and strength, and the treatments sought by claimant to manage her pain focused most significantly on her cervical and thoracic spine, where imagery contained more minimal findings like mild or minimal narrowing, small osteophytes, very minor subluxation, and mild stenosis. The objective findings and associated treatments in the record as a whole do not support a finding that the claimant could sit and stand for only short periods, nor do they suggest severe pain consistent with the off task limitations contained in the opinion.

(*Id.* at PageID # 55). Next, the ALJ addressed a psychological consultative exam, which is not relevant to the issues presented in this proceeding. (*Id.* at PageID # 55). The ALJ then addressed the state agency consultants, the Whole Body Assessment, and Dr. Hopkins's agreement with the Whole Body Assessment as follows:

Maureen Gallagher, D.O., a State Agency medical consultant, asserted that the claimant could perform light work with frequently climbing, stooping, crouching, and crawling (1A/10, 11). Dr. Gallagher asserted that the claimant had to avoid concentrated exposure to pulmonary irritants (1A/11). Mehr Siddiqui, M.D., another medical consultant, agreed with Dr. Gallagher generally, but Dr. Siddiqui added that the claimant could occasionally climb ladders, ropes, or scaffolds and she had to avoid all exposure to hazards. The undersigned finds such opinions persuasive in general because the evidence available to the medical consultants largely confirmed their findings. However, updated evidence established that the combination of the claimant's obesity, spinal conditions, and the effects of her breast cancer further limited her ability to be on her feet and required that she have the option to alternate positions along with limited reaching.

The claimant had a functional whole body evaluation with Michelle Godek, Ph.D. and Jamie Hart, P.T. (12F). The results showed that the claimant could perform medium work with lifting 22.5 pounds during desk and chair activity (12F/2). The examiners recommended that the claimant lift such weight on an occasional basis (12F/2). The examiner determined that the claimant could work four to five hours per day, sit for twenty minutes at a time for one to two hours in a day, and stand for twenty-five minutes at a time for one to two hours in a workday (12F/3). The examiners also stated that the claimant could walk four to five hours per day for long distances (12F/3). Additionally, the claimant was found to be able to occasionally balance, stoop, climb stairs, kneel, squat, crawl, and crouch (12F/3). Dr. Godek and Ms. Hart also noted that the claimant could frequently grasp on the right and occasionally on the left (12F/3).

The undersigned finds the conclusions of the functional whole body evaluation unpersuasive. While the conclusions were based on the functional whole body findings, the balance of the treatment examinations do not support a finding that claimant was subject to such substantial limitations. While she had ongoing neck pain and limited motion, she exhibited generally normal strength, sensation, reflexes, and gait. Additionally, she had generally mechanical symptoms only and she had conservative treatment. Nevertheless, in consideration of the claimant's ongoing spinal symptoms and her whole body assessment findings, the evidence supports a finding that the claimant was limited to standing and walking for no more than four hours in a workday.

Dr. Hopkins offered another assessment in 2020 where he said that he agreed with the functional capacity assessment and he adopted the results (15F/2). Dr. Hopkins stated that the claimant was unable to perform any full-time occupations and would require additional breaks that would make her off task in excess of fifteen percent of the workday (15F/2). Dr. Hopkins concluded that the claimant would be absent from work at least two days per month (15F/3). The undersigned finds Dr. Hopkins' opinion unpersuasive. As described above, the functional whole body assessment findings were inconsistent with the balance of the evidence. Additionally, Dr. Hopkins did not provide specific explanations of what facts and findings supported the conclusions that the claimant would be off task and miss work frequently. Finally, the determination of the ability to work is reserved to the Commissioner.

(*Id.* at PageID # 55-56). The ALJ then addressed Adams's alleged symptoms related to her neck

(among others not relevant to this proceeding) in comparison to the evidence, explaining:

As for her neck condition, the claimant had persistent neck pain and limited motion for which she took medication, received injections, and had physical therapy. While the claimant had continued pain and limited motion, she exhibited normal strength, sensation, reflexes, and gait. She also had only conservative treatment. Such facts are consistent with the finding that the claimant could perform the reduced range of light work described in the residual functional capacity.

(*Id.* at PageID # 56-57). The ALJ concluded:

In sum, the above residual functional capacity assessment is supported by the objective medical evidence of record and the opinions of the individuals that have had the opportunity to review the claimant's records and examine the claimant. Furthermore, the undersigned does not find that the claimant's symptoms are so severe as to prohibit her from performing all basic work activities. The residual functional capacity set forth above addresses the claimant's symptoms to the degree supported by the evidence as a whole.

(*Id.* at PageID # 57).

### 4. *Adams's Arguments*

As noted above, Adams argues that the ALJ's RFC assessment is not supported by substantial evidence, warranting reversal. (ECF Doc. No. 9, PageID # 1301). More specifically, Adams argues that the ALJ erred by finding the Whole Body Assessment and the opinions of Dr. Hopkins unpersuasive. (*Id.* at PageID # 1305-09).

### i.    *Whole Body Assessment*

Regarding the Whole Body Assessment, Adams argues that the ALJ erred by finding it unpersuasive because: (1) the ALJ only utilized the "consistency" factor in finding it unpersuasive but failed to consider the "supportability" factor; (2) it is an objective test, which gives it "significant weight because of the supportability factor[;]" (3) the ALJ does not have the expertise or regulatory authority to dispute objective findings; (4) even if the ALJ could dispute objective evidence, the ALJ's reasoning is vague and inaccurate, in part, because the ALJ did not provide citations or examples to support her contention that Adams had generally normal strength, sensation, reflexes, and gait; and (5) the record contains objective spinal examinations that contradict the ALJ's "vague claim." (*Id.* at PageID # 1302-04).

Regarding her last argument, Adams points to records reflecting: (1) abnormal muscle tone; (2) gait issues; (3) diminished strength or weakness; (4) diminished sensation; (5) tenderness; (6) increased or decreased deep tendon reflexes; and (7) painful or limited range of motion. (*Id.* at PageID # 1304). Adams acknowledges that the record also contains normal musculoskeletal examinations, but asserts that these examinations were performed during visits for cancer or other issues, and were not in-depth examinations. (*Id.*). Adams also points to evidence indicating that she received eight epidural injections, nerve median blocks, and radiofrequency ablations within a year and a half, which – she argues – is not "conservative treatment" as the ALJ found. (*Id.*). Adams concludes that the ALJ's use of other evidence to find the results of the Whole Body Assessment unpersuasive is "clearly not supported by substantial evidence." (*Id.*).

### *ii.* *Dr. Hopkins's Opinions*

Regarding Dr. Hopkins, Adams argues that the ALJ erred by finding his opinions unpersuasive because: (1) while the ALJ took issue with the supportability and consistency of Dr. Hopkins's opinions, the remaining three factors "are clearly in favor of finding his opinion persuasive" because (a) Dr. Hopkins treated Adams for nine years; (b) Dr. Hopkins's notes reflect his awareness of Adams's ongoing spinal issues; (c) Dr. Hopkins's specialty in family medicine makes him qualified to address Adams's ongoing spine condition; and (d) Dr. Hopkins's third opinion was directly influenced by the Whole Body Assessment; (2) objective evidence, including the Whole Body Assessment, supports and validates Dr. Hopkins's opinions; (3) the ALJ contradicted herself by referencing the March 1, 2019, MRI, but failing to include all of its findings, as well as findings from prior MRIs; (4) the ALJ's reasoning was vague, and lacked any examples or citations to support her finding that objective evidence did not support Dr. Hopkins's conclusions; and (5) regarding Dr. Hopkins's third opinion (*i.e.*, the opinion issued after the Whole Body Assessment), Dr. Hopkins provided explanations for his opinions, and did not opine as to any issues (*e.g.*, whether Adams is disabled or unable to work) reserved for the Commissioner. (ECF Doc. No. 9, PageID # 1305-09).

### *5.* *Analysis*

### *i.* *Whole Body Assessment*

Adams's argument that the ALJ erred by finding the Whole Body Assessment unpersuasive lacks merit. While Adams is correct that courts have considered Whole Body Assessments/Functional Capacity Assessments as objective tests, that does not preclude an ALJ from disputing its conclusions, as Adams suggests. *See Caesar v. Hartford Life & Acc. Ins. Co.*, 464 F. Appx. 431, 435 (6th Cir. 2012) (quoting *Huffaker v. Metro. Life Ins. Co.*, 271 Fed. Appx. 493, 500 (6th Cir.2008)) ("An FCE is generally a 'reliable and objective method of gauging the extent one can complete work-related tasks.'"); *Klapp v. Comm'r of Soc. Sec. Admin.*, No. 5:20-

CV-02850-JDG, 2022 WL 310228, at *20 (N.D. Ohio Feb. 2, 2022) (rejecting the claimant's argument that the ALJ erred by finding the FCE inconsistent with, and not supported by, the medical evidence in the record).

As noted, the ALJ explained that she found the conclusions of the Whole Body Assessment unpersuasive because they were not supported by the balance of the treatment examinations, Adams underwent conservative treatment, and Adams exhibited generally normal strength, sensation, reflexes, and gait. (ECF Doc. No. 7, PageID # 56). Adams asserts that the ALJ failed to support these conclusions with citations to the record. (ECF Doc. No. 9, PageID # 1303). That assertion, however, ignores the remainder of the RFC, which does include citations to the record. While the single paragraph in which the ALJ specifically refers to the Whole Body Assessment does not include citations, other paragraphs within the RFC specifically cite the treatment records that support the ALJ's conclusions in this regard. For example, the ALJ cited records indicating that: (1) Adams demonstrated normal reflexes, sensation, and strength (ECF Doc. No. 7, PageID # 53 (citing *id.* at  Exhibit 1F, PageID # 382)); (2) Adams presented with no sensory deficits, normal gait, and intact reflexes (ECF Doc. No. 7, PageID # 53 (citing *id.* at Exhibit 5F, PageID # 780, 785)); (3) Adams presented with no gait abnormalities (ECF Doc. No. 7, PageID # 54 (citing *id.* at Exhibit 6F, PageID # 824)); and (4) Adams presented with normal sensation, reflexes, and strength (ECF Doc. No. 7, PageID # 54 (citing *id.* at Exhibit 11F, PageID # 1032)).

Reading the ALJ's decision as a whole, Adams's argument that the ALJ failed to support her conclusions with citations to the record lacks merit. Moreover, while Adams points to records relating to her spinal condition and "abnormalities[,]" a "claimant does not establish a lack of substantial evidence by pointing to evidence of record that supports her position. Rather, [the claimant] must demonstrate that there is not sufficient evidence in the record that would allow a reasoning mind to accept the ALJ's conclusion." *Greene v. Astrue*, No. 1:10-cv-0414, 2010 WL

5021033, at *4 (N.D. Ohio Dec. 3, 2010); (ECF Doc. No. 9, PageID # 1304). Adams has not done so.

Additionally, Adams's argument challenging the ALJ's categorization of her treatment as "conservative" lacks merits. Adams supports her argument in this regard by pointing to evidence indicating that she received eight epidural injections, nerve median blocks, and radiofrequency ablations within a year and a half. Courts, however, have described epidural injections, nerve blocks, and radiofrequency ablations as conservative treatment. *See, e.g.*, *Weidman v. Comm'r of Soc. Sec.*, No. 1:17-CV-01262, 2018 WL 4473368, at *9 (N.D. Ohio May 29, 2018), *report and recommendation adopted*, No. 1:17CV1262, 2018 WL 3913688 (N.D. Ohio Aug. 16, 2018) (collecting cases and acknowledging that epidural injections and nerve blocks are considered "conservative" treatment); *Bruton v. Am. United Life Ins. Corp.*, 798 F. Appx. 894, 900 (6th Cir. 2020) (referring to  radiofrequency ablations as a "conservative" therapy). Adams's argument in that regard, therefore, lacks merit.

Lastly, Adams's argument regarding the supportability of the Whole Body Assessment lacks merit. Adams argues that, because the Whole Body Assessment is an objective test, "it gains significant weight because of the supportability factor[,]" and the ALJ had no authority to dispute its objective findings. (ECF Doc. No. 9, PageID # 1303). While the ALJ did not specifically use the term "supportability" in her evaluation of the Whole Body Assessment, she was not required to, and a reading of the ALJ's decision as a whole indicates that the ALJ implicitly found that the Whole Body Assessment was not supported by the medical evidence. *See Cormany v. Kijakazi*, No. 5:21CV933, 2022 WL 4115232, at *3, 5 (N.D. Ohio Sept. 9, 2022). For example, as noted above, the ALJ cited evidence indicating that Adams presented with a normal strength, sensation, reflexes, and gait, and that Adams received conservative treatment, *i.e.*, epidural steroid injections, medial branch blocks, and radiofrequency ablations (ECF Doc. No. 7, PageID # 53-53)). Adams

acknowledges that the record contains normal musculoskeletal examinations, but she argues that they were not in-depth examinations because they were performed during Adams's visits for cancer or other matters. (ECF Doc. No. 9, PageID # 1304). Adams's argument in this regard is unpersuasive. The ALJ's decision, read as a whole, demonstrates that the ALJ considered the supportability factor, and Adams has not established that the ALJ's decision in that regard lacks the support of substantial evidence.

### ii.    Dr. Hopkins's Opinions

Adams's argument that the ALJ erred by finding the opinions of Dr. Hopkins unpersuasive lacks merit. Initially, regarding Dr. Hopkins's third opinion, I note that Dr. Hopkins's agreement with the Whole Body Assessment in that opinion is sufficient to transform the Whole Body Assessment into his own opinion. *Keller v. Comm'r of Soc. Sec.*, No. 1:21-CV-1856, 2022 WL 2304495, at *8 (N.D. Ohio June 27, 2022). The ALJ, therefore, was required to evaluate the persuasiveness of that opinion using the factors set forth in 20 C.F.R. §§ 416.920c(a), (c)(1)-(5), with consistency and supportability being the most important factors. 20 C.F.R. § 416.920c(a).

Adams argues that the ALJ erred by finding Dr. Hopkins's opinions unpersuasive for several reasons, the first of which is that, while the ALJ "took issue" with the consistency and supportability factors, the remaining factors under 20 C.F.R. § 416.920c(c) support the persuasiveness of Dr. Hopkins's opinions. (ECF Doc. No. 9, PageID # 1306). Adams acknowledges, however, that consistency and supportability are the most important factors an ALJ considers when evaluating the persuasiveness of a medical opinion. (*Id.*); 20 C.F.R. § 404.1520c(b)(2). Thus, even if the other factors support the persuasiveness of Dr. Hopkins's opinions, that alone does not render the ALJ's decision in this regard as lacking substantial evidence because the ALJ was not even required to address those factors. *Serowski v. Comm'r of Soc. Sec.*, No. 1:19-CV-2761, 2020 WL 6383187, at *12 (N.D. Ohio Oct. 30, 2020) (citing 20

C.F.R. § 404.1520c(b)(2)-(3)) ("[B]ecause the ALJ found [the doctors'] opinions were both inconsistent and not supported, she was not required to provide any further explanation.").

Adams's other arguments also lack merit. Adams argues that Dr. Hopkins's opinions were supported by objective evidence, but fails to acknowledge the medical records the ALJ cited in her RFC that support her conclusion that Dr. Hopkins's opinions were not supported by the record as a whole. (*See, e.g.*, ECF Doc. No. 7, PageID # 53-54). As noted, this includes records indicating that: (1) Adams demonstrated normal reflexes, sensation, and strength (ECF Doc. No. 7, PageID # 53 (citing *id.* at Exhibit 1F, PageID # 382)); (2) Adams presented with no sensory deficits, normal gait, and intact reflexes (ECF Doc. No. 7, PageID # 53 (citing *id.* at Exhibit 5F, PageID # 780, 785)); (3) Adams presented with no gait abnormalities (ECF Doc. No. 7, PageID # 54 (citing *id.* at Exhibit 6F, PageID # 824)); and (4) Adams presented with normal sensation, reflexes, and strength (ECF Doc. No. 7, PageID # 54 (citing *id.* at Exhibit 11F, PageID # 1032)). Adams also argues that the ALJ contradicted herself by citing only a portion of an MRI, and by not citing other MRIs contained within the record. But "[a]n ALJ need not cite every piece of evidence in the record and 'an ALJ's failure to cite specific evidence does not indicate it was not considered.'" *Daniels v. Comm'r of Soc. Sec.*, 152 F. Appx. 485, 489 (6th Cir. 2005) (quoting *Deaner v. Comm'r of Soc. Sec.*, 840 F. Appx. 813, 819 (6th Cir. 2020)). Again, Adams argues that the ALJ's opinion was vague, lacking any examples or citations. As previously explained, that is not an accurate representation of the ALJ's RFC when read as a whole.

Lastly, Adams argues that the ALJ erred by determining that Dr. Hopkins did not support his third opinion (*i.e.*, the opinion wherein Dr. Hopkins agreed with the Whole Body Assessment) with specific explanations as to why Adams would be off-task and miss work, and that the ALJ erred by determining that Dr. Hopkins opined as to issues reserved for the Commissioner. (ECF Doc. No. 9, PageID # 1308). In support of her argument that Dr. Hopkins did, in fact, explain his

22

reasoning, Adams points to Dr. Hopkins's two prior opinions wherein: (1) Dr. Hopkins indicated that his conclusions regarding Adams's limitations were based on her "pain[;]" (2) Dr. Hopkins indicated that Adams was "unable to sit or stand for prolonged periods (>30 min) due to pain[;]" and (3) Dr. Hopkins circled "15%+" in response to a question asking, "[p]lease provides an opinion to the approximate percentage which the claimant would be off-task at work due to unreasonable breaks/rest periods, interferences with concentration, persistence or pace, or other related reasons." (ECF Doc. No. 7, Exhibit 9F, PageID # 880;  *id.* at Exhibit 8F, PageID # 869). Even assuming that these are "specific explanations[,]" any error in the ALJ's conclusion that Dr. Hopkins failed to provide specific explanations, or that he opined as to issues reserved for the Commission, does not establish that the ALJ's decision lacks the support of substantial evidence.

Here, because the ALJ's conclusion that Dr. Hopkins's opinions were not consistent and not well-supported were reasonably drawn from the record, the ALJ's conclusion fell within the Commissioner's "zone of choice." *Serowski v. Comm'r of Soc. Sec.*, No. 1:19-CV-2761, 2020 WL 6383187, at *12 (N.D. Ohio Oct. 30, 2020) (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). "And, even if a preponderance of the evidence might have supported a different conclusion, this court is not permitted to second-guess the ALJ's decision when substantial evidence supported it." *Id.* Because Adams has not established that the ALJ's decision lacks the support of substantial evidence, her argument lacks merit.

## VI.     RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court AFFIRM the ALJ's decision.

Dated: <u>January 23, 2023</u>

<u>*s/ Jennifer Dowdell Armstrong*</u>
Jennifer Dowdell Armstrong
U.S. Magistrate Judge

## VII.    NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

**Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates

Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).