## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| Jenny L. Adams, | Case No. 1:21CV2199 |
| **Plaintiff,** | |
| -vs- | **JUDGE PAMELA A. BARKER** |
| | **Magistrate Judge Jennifer Dowdell Armstrong** |
| Kilolo Kijakazi,<br>**Acting Commissioner of Social Security** | |
| | **MEMORANDUM OPINION AND ORDER** |
| **Defendants.** | |

This matter is before the Court on the Objections of Plaintiff Jenny L. Adams ("Plaintiff" or "Adams") to the Report and Recommendation of Magistrate Judge Jennifer Dowdell Armstrong regarding Plaintiff's request for judicial review of Defendant Commissioner of the Social Security Administration's ("Defendant" or "Commissioner") denial of her application for Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.  (Doc. No. 15.)  For the following reasons, Plaintiff's Objections are OVERRULED, the Report & Recommendation ("R&R") is ADOPTED, and the Commissioner's decision is AFFIRMED.

## I.      Background

In August 2019, Adams filed her application for POD and DIB**,** alleging a disability onset date of June 5, 2019.  (Doc. No. 7 (Transcript ["Tr."]) at 170.)  The application was denied initially and upon reconsideration, and Adams requested a hearing before an administrative law judge ("ALJ").  (Tr. 23.)  On September 4, 2020, the ALJ conducted a telephonic hearing at which Adams was represented by counsel and testified.  (Tr. 39-79.)  A vocational expert ("VE") also testified.  (*Id.*)

On November 4, 2020, the ALJ found that Adams was not disabled. (Tr. 23-34.)  The ALJ determined that Adams suffered from the severe impairments of degenerative disc disease of the cervical, thoracic, and lumbar spines; breast cancer; obesity; major depressive disorder; and anxiety disorder.  (Tr. 25.)  The ALJ found that Adams' impairments did not meet or medically equal the requirements of a listed impairment and that she retained the residual functional capacity ("RFC") to perform a reduced range of light work.  (Tr. 26-32.)  The ALJ then concluded that Adams could perform her past relevant work as an administrative clerk and, therefore, was not disabled.  (Tr. 32-34.)  The Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision.  (Tr. 9-14.)

Adams seeks judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383(c).  (Doc. No. 1.)  The case was referred to the Magistrate Judge pursuant to 28 U.S.C. § 636 and Local Rule 72.2(b)(1) for a Report and Recommendation. The R&R concludes that the ALJ's decision is supported by substantial evidence and recommends that the decision be affirmed.  (Doc. No. 15.)  Adams filed Objections to the R&R, to which the Commissioner responded.  (Doc. Nos. 16, 17.)

Adams raises the following objections to the R&R:

1.    The Report and Recommendation did not address all of Plaintiff's arguments and the ALJ cannot invalidate objective testing.

2.    The ALJ's review of the Opinions lacked adequate explanation.

3.    The ALJ's Decision lacked an adequate review of the relevant records.

(Doc. No. 16.)  The Commissioner filed a Response to Adams' Objections on February 8, 2023. (Doc. No. 17.)  The Court has conducted a *de novo* review of the issues raised in Adams' Objections.

## II.    Relevant Evidence[1]

On August 24, 2018, Adams presented to her primary care physician, Kevin Hopkins, M.D., with complaints of continued thoracic back pain, muscle spasms, and a "burning feeling that will go up into her neck and shoulder." (Tr. 469-470.)  She reported having undergone four injections (with the last one being in May 2018) and physical therapy, with little relief.  (*Id.*)  Pertinent here, Dr. Hopkins diagnosed thoracic spondylosis without myelopathy and osseous stenosis of neural canal of thoracic region, and prescribed Metaxalone.  (*Id.*)  He ordered an MRI of Adams' thoracic spine and referred her to physical therapy.  (*Id.*)  Adams underwent the MRI on September 5, 2018, which revealed "degenerative changes of the lower thoracic spine with mild canal stenosis most prominent at T9-12."[2]  (Tr. 609.)

On September 24, 2018, Adams presented to Adrian Zachary, D.O., for evaluation of her chronic lower back pain.  (Tr. 460-465.)  On examination, Dr. Zachary noted (1) a slow gait with forward flexed posture, (2) moderate balance difficulty with tandem gait; (3) abnormal posture and spinal curves, and (4) tenderness to palpation over Adams' lower thoracic paraspinals, left greater than right.  (Tr. 463.)  He also noted a host of normal findings, including negative straight leg raise; normal Babinski; normal reflexes in Adams' knee, ankle, and medial hamstring; normal hip range of motion, flexion, and rotation; normal Faber's test; normal Gaenslen's maneuver; normal Ober's test; normal upper body reflexes; and full 5/5 strength in Adams' upper and lower extremities.  (Tr. 464.)

---

[1] The Court sets forth only that evidence that is necessary to a resolution of Adams' Objections and is cited by the parties in their Briefs on the Merits, Objections, and Response to Objections.

[2] Specifically, this imaging stated, in pertinent part, as follows: "Canal and foramina.  Redemonstrated is facet and ligamentous hypertrophy causing mild canal narrowing at T9-10, T10-11, and T11-12.  There is mild effacement of the left lateral aspect of the cord at T11-12.  Otherwise multilevel facet and ligamentous hypertrophy with no significant canal or foraminal narrowing." (Tr. 609.)

Dr. Zachary diagnosed thoracic spine pain and costochondral chest pain, likely due to thoracic facet arthropathy.  (Tr. 465.)

On November 19, 2018, Adams returned to Dr. Zachary with continued complaints of thoracic spine pain.  (Tr. 453-456.)  On examination, Dr. Zachary noted reduced muscle stretch reflexes at Adams' bilateral knees, ankles, and medial hamstrings; "painful arc of motion" in her thoracic spine; and deep palpation tenderness over her left thoracic paraspinal muscles.  (Tr. 454.)  He also noted no apparent weakness in C-5 through T-1 and L2 through S1, and no focal sensory deficits or nerve root tension signs.  (*Id*.)  Dr. Zachary administered medial branch blocks at Adams' left thoracic T4 through T8.  (Tr. 455.)

Adams presented to Stephanie Ziegman, APRN, on December 21, 2018.  (Tr. 444-448.) Adams reported that she received 80-90% pain relief for about 1 week after her medial branch blocks, but then "returned to baseline."  (Tr. 445.)  She rated her current pain an 8 on a scale of 10.  (*Id*.)  On examination, Nurse Ziegman noted normal gait, normal posture and spinal curves, no palpable muscle spasms, normal flexion and extension of the lumbar spine, normal reflexes, negative straight leg raise, and normal lower extremity muscle strength and tone.  (Tr. 447-448.)  Nurse Ziegman diagnosed thoracic spondylosis without myelopathy and ordered repeat medial branch blocks.  (Tr. 448.)

On February 4, 2019, Adams returned to Dr. Zachary for medial branch blocks, again at her left thoracic T4 through T8.  (Tr. 440-442.)  At the onset of the procedure, Adams "began to get quite uncomfortable continuously moving her right greater than left lower limb" and reported an "incessant need to move her leg." (Tr. 433, 436.)  Dr. Zachary proceeded with the procedure, after which Adams continued to have significant restless leg on the right side.  (*Id*.)

4

Adams returned to Dr. Zachary on February 22, 2019.  (Tr. 433-435.)  She reported "worsening neurologic symptoms," including cervical spine pain and paresthesias radiating down her left upper limb, balance issues, severe pain along the left upper scapular border, weakness and clumsiness in her left lower limb, and difficulty sleeping.  (Tr. 433.)  On examination, Dr. Zachary noted as follows:

> Strength in left lower limb diminished with dorsiflexion, plantar flexion and knee extension.  Patient with difficulty performing these activities almost as if upper motor neuron involvement.  Sensation intact bilateral lower limbs except for diminished sensation in the left L5 and S1 dermatomal distribution compared to the right, however, in general diminished sensation to light touch and pinprick throughout the left lower limb in all dermatomes.

> Reflexes bilateral patella 3+ right medial hamstring 0, left medical hamstring and bilateral Achilles 2+.  Strength intact in bilateral upper limbs except for mild left hand intrinsic weakness and subtle left triceps weakness compared to the right.  Sensation intact in bilateral upper limbs except for diminished sensation in the left C7 and C8 dermatomes.  Reflexes bilateral biceps 2+, left triceps absent, right triceps diminished.  Muscular tenderness to palpation bilateral cervical paraspinal muscles and upper trapezius and along the right medial scapular border.  Patient with difficulty performing tandem gait, no clear evidence of clonus.

(Tr. 434-435.)  Dr. Zachary diagnosed (1) cervical spine pain, (2) spinal stenosis of the cervical region, (3) radiculopathy of the lumbar region; and (4) balance disorder.  (Tr. 435.)  He ordered imaging of Adams' cervical and lumbar spines.  (*Id.*)

Adams underwent an x-ray of her cervical spine on February 23, 2019, which revealed mild disc space narrowing at C5/C6 with loss of normal motion with flexion and extension.  (Tr. 598-599.) She underwent an MRI of her cervical spine two days later, which showed "no significant abnormality of the cervical spine," i.e., "no evidence of high-grade canal compromise or cervical cord pathology to explain balance disorder."  (Tr. 596-597.)  Finally, Adams underwent an MRI of her lumbar spine on March 1, 2019, which showed (1) minimal disk bulging at L4-L5, without significant central canal

5

or neural foraminal stenosis; and (2) bulging disk, facet arthropathy, and ligamentous hypertrophy at L5-S1, resulting in minimal effacement of the anterior subarachnoid space and severe right and moderate left foraminal stenosis which is also the basis of rostrocaudal faucet migration.  (Tr. 593-594.)

Dr. Zachary noted that neither the lumbar nor cervical MRI showed large disc herniations or severe compression that might explain Adams' symptoms.  (Tr. 431.)  He was not certain that he had an explanation for her severe restless leg symptoms.  (*Id*.)  On March 8, 2019, Adams returned to Nurse Ziegman with complaints of back pain and fatigue.  (Tr. 426-430.)  Examination findings were normal.  (Tr. 429-430.)  With the approval of Dr. Zachary, Nurse Ziegman ordered medial branch radio frequency ablation ("RFA") of Adams' left thoracic spine at T4 through T8.  (Tr. 430.)

On March 11, 2019, Adams presented to the emergency department with complaints of worsening upper back pain resulting in an inability to sleep.  (Tr. 422-425.)  On examination, Adams was noted to be distressed and in moderate discomfort.  (Tr. 424.)  Examination findings were largely normal aside from palpable tenderness of the left upper back diffusely.  (*Id*.)  Adams was administered pain medication and discharged. (Tr. 425.)

Adams returned to the emergency department on March 20, 2019.  (Tr. 417-421.)  She reported that she had passed out while driving and had hit a tree.  (Tr. 379, 418.)  Adams also reported that she had been having sleepwalking episodes "where she is moving the furniture and does not recall doing this and she has fallen a few times."  (Tr. 418.)   Adams was admitted to the hospital with concerns of syncope.  (Tr. 413.)  Adams underwent a CT of her brain, which was normal.  (*Id*.)  She also underwent an echocardiogram and an MRI of her brain, both of which were normal.  (*Id*.)  Adams' hospital physicians suspected that her symptoms were due to back pain and sleep deprivation.

6

(*Id.*)  She was discharged on March 22, 2019, with instructions to follow up with a sleep study and a pain management specialist.  (*Id.*)  Adams was also advised that she should not drive for at least six months after her symptoms had resolved.  (Tr. 414.)

On March 29, 2019, Adams returned to Dr. Hopkins for follow-up after her hospitalization.  (Tr. 374-378.)  She attributed her sleep deprivation to chronic neck, thoracic, and lumbar back pain, and reported that she had been sleepwalking about twice per week.  (Tr. 374-375.)  Adams was anxious and tearful at her appointment and requested clearance to drive.[3]  (Tr. 375-377.)  Dr. Hopkins determined that "if she feels safe to drive based on sleep, then she is cleared to drive."  (Tr. 376, 377.)  He referred her for consultations with pain management and sleep medicine and increased her Gabapentin dosage.  (Tr. 377-378.)

On April 10, 2019, Adams underwent RFA on her left thoracic spine T4 through T8.  (Tr. 368-373.)  She returned to Nurse Ziegman on April 29, 2019 and reported that her pain was 95% improved in her mid-back since the RFA.  (Tr. 364.)  Adams rated her pain a 3 on a scale of 10.  (*Id.*)  Examination findings were largely normal aside from abnormal patellar reflexes (3+) bilaterally.  (Tr. 367.)  Nurse Ziegman ordered a T1-T2 epidural injection, which Adams underwent on June 12, 2019.[4]  (Tr. 367, 355-359.)

On June 10, 2019, Adams presented to certified nurse practitioner Amanda Mitsch, CNP, for evaluation of her sleep problems.  (Tr. 360-362.)  Adams reported that she had thought her back pain

---

[3] At this time, Adams was working two days per week as a physical therapy assistant.  (Tr. 374-376, 360.)

[4] When she presented for her injection on that date, Nurse Ziegman performed a physical examination, which revealed normal pulses and reflexes, no apparent muscle weakness in C5 through T1 and L2 through S1, absent focal sensory deficits, and absent nerve root tension signs.  (Tr. 357.)  However, Nurse Ziegman also noted painful arc of motion in Adams' neck in flexion and extension, and deep palpation tenderness over her bilateral cervical paraspinal muscles. (*Id.*)

was keeping her from sleeping but stated that her back pain had improved since her last back ablation and increased Gabapentin dosage.  (Tr. 360.)  Physical examination findings were normal, including normal gait.  (Tr. 361.)  CNP Mitsch diagnosed chronic insomnia, anxiety, history of sleep walking, and thoracic spondylosis.  (*Id*.)  She prescribed Trazadone.  (*Id*.)

Adams returned to Nurse Ziegman on June 27, 2019 for follow up.  (Tr. 350-353.)  She reported "very little pain relief" since her T1-T2 injection, but only rated her pain a 3 on a scale of 10.  (Tr. 350.)  Examination findings were largely normal aside from decreased cervical flexion, extension, and rotation. (Tr. 353.)  Nurse Ziegman ordered cervical X-rays and left C6-C7 and C7-T1 facet joint injections with steroids.  (*Id*.)  Adams underwent the cervical X-rays the following day, which were unremarkable.  (Tr. 549-550.)

On July 8, 2019, Adams presented to the emergency department with complaints of dizziness. (Tr. 342-345.)  Physical examination findings were normal, including normal range of motion in Adams' neck and back, normal muscle tone, normal coordination, and no numbness or weakness in Adams' legs.  (Tr. 344.)  Adams was discharged after receiving IV fluids.  (*Id.*)

Adams presented to Wyatt Kupperman, M.D., for cervical injections on August 5, 2019.  (Tr. 326-331.)  On examination, Dr. Kupperman noted painful arc of motion in Adams' neck in left rotation, extension, and bending; and deep palpation tenderness over her left cervical paraspinal muscles.  (Tr. 328.)  Later that month, Adams returned to Nurse Ziegman for follow-up.  (Tr. 299-304.)  She stated that she received 100% pain relief for 4 hours after her injections, and then 75% pain relief for 24 hours, and then "slowly returned to baseline." (Tr. 300.) Adams rated her current pain a 6 on a scale of 10.  (*Id*.)  On examination, Nurse Ziegman noted normal gait, normal posture and spinal curves, no palpable muscle spasm or tenderness, normal reflexes, normal muscle tone,

8

normal sensation, and normal upper extremity muscle strength.  (Tr. 303.)  She did, however, note that Adams' cervical rotation was limited with pain as well as decreased cervical flexion and extension.  (*Id.*)

In the summer of 2019, Adams was diagnosed with right breast cancer.  (Tr. 305.)  She underwent a lumpectomy on August 21, 2019.  (Tr. 305-317.)  Adams presented to Andrew Vassil, M.D., on September 17, 2019 for evaluation for radiation therapy.  (Tr. 776-781.)  On examination, Dr. Vassil noted normal gait, normal range of motion in Adams' extremities, and no bone or spine tenderness.  (Tr. 779.)

Adams presented to Dr. Kupperman for medial branch blocks in her left cervical spine at C6-7 and C7-8 on September 30, 2019.  (Tr. 757-762.)  On examination, Dr. Kuppmerman noted normal pulses and muscle stretch reflexes and no focal sensory deficits or nerve root tension signs, but also noted weakness in Adams' right elbow flexion and extension, painful arc of motion in Adams' neck, and deep palpation tenderness in her left cervical spinal muscles.  (Tr. 760.)  One week later, Adams reported that she had experienced 100% pain relief for 3 days from her medial branch blocks but that her pain had now returned to baseline, which she rated a 5 on a scale of 10.  (Tr. 752.)  Physical examination findings were normal aside from decreased cervical flexion, rotation, and extension.  (Tr. 755.)

On October 14, 2019, Adams returned to CNP Mitsch.  (Tr. 746-751.)  Physical examination findings were normal, including a straight and symmetric back, no pinpoint spinal tenderness, and no costovertebral angle tenderness.  (Tr. 749.)  Shortly thereafter, Adams underwent RFA of her left cervical spine at C6, 7 and 8. (Tr. 740.)  Physical examination findings were normal aside from painful

9

arc of motion in Adams' neck, and deep palpation tenderness in her left cervical spinal muscles.  (Tr. 742.)

Adams returned to CNP Mitsch on December 23, 2019, with complaints of a flare up in her neck pain.  (Tr. 797-800.)  Adams rated her pain a 7 on a scale of 10.  (Tr. 799.)  Physical examination findings were normal, aside from tenderness in Adams' neck.  (*Id*.)  CNP Mitsch increased Adams' Gabapentin dosage, discussed the possibility of adding a low dose of Cymbalta, and referred Adams for acupuncture.  (*Id*.)

On January 21, 2020, Adams returned to Dr. Zachary for evaluation of additional treatment options for her diffuse pain complaints in the cervical spine.  (Tr. 834-836.)  Adams reported ongoing, significant pain in her cervical spine, and along the left paraspinal muscles and upper trapezius region.  (*Id*.)  On examination, Dr. Zachary noted intact strength, sensation, and reflexes in Adams' bilateral upper limbs but also noted tenderness in her cervical paraspinal muscles and along the spinous process at the C7-T1 level.  (Tr. 836.)  Although Dr. Zachary had planned to administer RFA in Adams' lower cervical medial branch, he determined it would not be possible due to a high degree of vascularity.  (Tr. 834.)  He was not certain that he had "cleared guidance for any further treatment recommendations" but thought that intraspinous ligament injections at the C7 – T1 and T1 -T2 levels "may offer her some relief."  (Tr. 836.)  Adams indicated that she would consider the injections. (*Id*.)

Adams returned to Dr. Hopkins on February 13, 2020.  (Tr. 897.)  She reported that she had quit her part-time job as a physical therapy assistant at the end of 2019 because she was no longer physically able to do the job.  (*Id*.)  Examination of her neck revealed limited range of motion in all planes, particularly with lateral rotation and bending.  (Tr. 899.)  Adams' gait and upper extremity muscle strength were both normal.  (*Id*.)

10

On that same date, Dr. Hopkins completed a Physical Residual Functional Capacity Assessment regarding Adams' physical functional abilities.  (Tr. 843-851.)  Dr. Hopkins opined that Adams could (1) occasionally lift and carry less than ten pounds; (2) frequently lift and carry less than ten pounds; (3) stand and/or walk a total of at least 2 hours in an 8 hour workday; (4) sit for a total of less than about 6 hours in an 8 hour workday; (5) push and/or pull on an unlimited basis, other than as shown for lift and/or carry; (6) frequently climb ramps and stairs; and (7) frequently crawl. (Tr. 844-845.)  He further opined that Adams had a limited capacity to reach in all directions, including overhead.  (Tr. 846.)  Dr. Hopkins based these conclusions on Adams's "constant, chronic neck pain . . . with intermittent pain radiating into left hand." (Tr. 844.)  He also indicated that Adams has "moderate exaggeration of cervical lordosis, upper thoracic hypertrophy, kyphosis, eccentric to the left disc osteophyte complex, uncovertebral hypertrophy, facet arthrosis at C5/C6 level with moderate narrowing of the spinal canal [and] left neural foramen."  (Tr. 850.)

Shortly thereafter, on February 22, 2020, Dr. Hopkins completed a Medical Questionnaire regarding Adams' physical functional limitations.  (Tr. 854-855.)  Therein, he indicated that Adams suffered from spondylosis of the cervical spine and that she experienced the following symptoms: (1) nerve root compression and neuro-anatomic distribution of pain, both at C6, C7, and C8; (2) limitation of motion of the spine; and (3) muscle weakness.  (Tr. 854.)  Dr. Hopkins opined that Adams would be off-task 15% of the workday due to unreasonable breaks/rest periods, interference with concentration, persistence or pace, or other related reasons.  (Tr. 855.)  Lastly, he opined that Adams would be unable to sit or stand for prolonged periods (>30 minutes) due to pain.  (*Id*.)

On February 20, 2020, Adams presented to Dr. Zachary for the intraspinous ligament injections at the C7 – T1 and T1 -T2 levels.  (Tr. 933-941.)  After the injections, Adams "began to

flop her limbs and shake" in seizure-like activity for 30 seconds.  (Tr. 938.)  She was alert and oriented after the episode but could not remember anything.  (*Id*.)  Adams was transferred to the hospital in stable condition for further evaluation.  (*Id*.)  While at the hospital, Adams underwent an EKG, a 20-minute EEG, and a CT and an MRI of her brain.  The EKG and EEG were both normal and the CT scan was unremarkable.  (Tr. 993, 1009, 1013, 1035-1036.)  The MRI showed evidence of an intracranial process but no enhancing lesion to suggest metastasis.  (Tr. 1033-1034.)  Neurological examination findings were normal, including normal muscle tone and 5/5 strength in the upper and lower extremities, intact sensation in all four extremities, normal reflexes, and normal coordination.  (Tr. 1007-1008.)  Adams was discharged on February 21, 2020, with instructions to follow up with the Epilepsy Department as an outpatient.  (Tr. 1009.)

Adams had a virtual visit with Andrey Stojic, M.D., at the Cleveland Clinic Epilepsy Center on March 23, 2020.  (Tr. 1160-1165.)  She reported "doing okay."  (Tr. 1164.)  Dr. Stojic diagnosed "single seizure" and advised Adams not to drive until she was cleared by a physician.  (Tr. 1165.)

On September 3, 2020, Jamie Hart, P.T., A.T., D.P.T., and Michelle Godek, Ph.D., A.T., conducted a Key Functional Whole Body Assessment of Adams. (Tr. 1203-1210.)  The cover letter accompanying this assessment reads, in relevant part, as follows:

> This is identified to be a Valid representation of the present physical capabilities of Jenny L. Adams based upon consistencies and inconsistencies when interfacing grip dynamometer graphing, resistance dynamometer graphing, heart rate variations, weights achieved, and selectivity of pain reports and pain behaviors.  The client is demonstrating full effort.  The results represent the current safe capability of the client.
>
> Although this report contains the patient/client's pain reports and pain behaviors, it should be noted that the Validity Determination is based upon the objective data that was collected and the formulas using that data.

(Tr. 1203.)  The Assessment then summarized Adams' physical functional abilities as follows:

| Activity | Client Capabilities |
|---|---|
| Work Day | 4 to 5 hours |
| Sit | 1 to 2 hours (20 minute duration) |
| Stand | 1 to 2 hours (25 minute duration) |
| Walk | 4 to 5 hours (frequent long distances) |

| Activity | Occasional | Frequent |
|---|---|---|
| Above Shoulders Lift-Bilateral | 14.8 lbs. | *** |
| Desk/Chair Lift- Bilateral | 22.5 lbs. | 11.5 lbs. |
| Chair/Floor Lift- Bilateral | 21.4 lbs. | 12.6 lbs. |
| Push | 77.7 lbs. | *** |
| Pull | 68.9 lbs. | 24.5 lbs. |
| Carry – Right | 17.4 lbs. | *** |
| Carry- Left | 15.2 lbs. | 8.6 lbs. |

(Tr. 1204.)  The Assessment also concluded that Adams could (1) frequently engage in simple, firm, and fine grasping with her right hand; (2) occasionally engage in simple, fine, and firm grasping with her left hand, (3) occasionally balance, bend/stoop, climb stairs, crawl, crouch, kneel, squat, and use her bilateral feet; and (4) "minimally occasionally" flex and rotate her head/neck.[5] (*Id*.)

On September 8, 2020, Dr. Hopkins answered questions contained within a letter sent to him by Adams' counsel.  (Tr. 1258-1259.)  Therein, Dr. Hopkins indicated that he had been treating Adams for 9 years and that she suffered from cervical spondylosis, thoracic spondylosis, depression, anxiety, hypertension, impaired fasting glucose, asthma, and "thyroid."  (*Id*.)  Dr. Hopkins stated that,

---

[5] The form defined the terms (1) "frequently" as 34-66% of the workday (or 2.5 to 5.5 hours); (2) "occasionally" as 6 to 33% of the workday (or .5 to 2.5 hours); and (3) "minimally occasionally" as 1-5% of the workday (or 0 to .5 hours).  (Tr. 1204.)

after reviewing the Whole Body Assessment discussed above, he agreed with the Assessment and adopted its results. (*Id*.) He further opined that the Assessment was an accurate reflection of Adams' limitations from June 2019 to the present and that Adams would be unable to perform any full-time occupations. (*Id*.) Dr. Hopkins opined that Adams would require additional breaks or be off-task in order to perform full time work and that her breaks would, on average, cause her to be off-task more than 15% of a workday. (*Id*.) Finally, Dr. Hopkins found that Adams would be absent from work for at least two (2) days per month because of her conditions. (*Id*.)

## III. Standard of Review

Under 28 U.S.C. § 636(b)(1), "[a] judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C); *see Powell v. United States*, 37 F.3d 1499 (Table), 1994 WL 532926 at *1 (6th Cir. Sept. 30, 1994) ("Any report and recommendation by a magistrate judge that is dispositive of a claim or defense of a party shall be subject to *de novo* review by the district court in light of specific objections filed by any party.") (citations omitted); *Orr v. Kelly*, 2015 WL 5316216 at *2 (N.D. Ohio Sept. 11, 2015) (citing *Powell,* 1994 WL 532926 at *1). *See also* Fed. R. Civ. P. 72(b)(3). "A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. §636(b)(1).

Under the Social Security Act, a disability renders the claimant unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment that can result in death or that can last at least twelve months. 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). The impairment must prevent the claimant from doing the claimant's previous work, as well as any other work which exists in significant numbers in the region where the individual lives or in several

14

regions of the country.  42 U.S.C. § 423(d)(2)(A).  Consideration of disability claims follows a five-step review process.[6] 20 C.F.R. § 404.1520.

The Court's review of the Commissioner's decision to deny benefits is limited to determining whether the ALJ applied the correct legal standards and whether the findings are supported by substantial evidence.  42 U.S.C. § 405(g).  "Substantial evidence is 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *McGlothin v. Comm'r of Soc. Sec.*, 299 Fed. Appx. 516, 521 (6th Cir. 2008) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal citation omitted)).

If substantial evidence supports the Commissioner's finding that the claimant is not disabled, that finding must be affirmed even if the reviewing court would decide the matter differently.  *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (citation omitted).  A reviewing court is not permitted to resolve conflicts in evidence or to decide questions of credibility.  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007) (citation omitted).  Moreover, the Commissioner's

---

[6] Under this five-step review, the claimant must first demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) and 416.920(d).  Before considering step four, the ALJ must determine the claimant's residual functional capacity; i.e., the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from his/her impairments. 20 C.F.R. § 404.1520(e) and 416.930(e).  At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g). *See Abbot*, 905 F.2d at 923.

decision must be affirmed even if substantial evidence also exists in the record to support a finding of disability.  *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).

**IV.     Plaintiff's Objections to the R&R**

    **A.     Evaluation of the Whole Body Assessment**

In her first Objection, Adams argues that the R&R failed to sufficiently address her argument that the ALJ did not have the capacity to discredit objective evidence such as the Whole Body Assessment.  (Doc. No. 16 at pp. 1-3.)  Adams asserts that her Whole Body Assessment is unique because, having been performed by an acceptable medical source and adopted by Dr. Hopkins, it constitutes both "inherently objective" medical evidence and a medical opinion regarding her physical functional limitations.  (*Id.*)  She maintains that "[l]ogic dictates that objective tests like an MRI, Spirometry test, or this [Assessment] cannot be diminished by other evidence, unless it is directly invalidated by another medical opinion."  (*Id.* at p. 2.)  Thus, Adams asserts that the ALJ's reliance on her previous normal examination findings and allegedly conservative treatment to discredit the Assessment was misplaced and inappropriate.  (*Id.*)  In sum, Adams argues that the ALJ erroneously "played doctor" when she "invalidated" (and adopted an RFC that was inconsistent with) the Assessment.  (*Id.*)

The Commissioner argues that the ALJ properly discounted the Whole Body Assessment as being inconsistent with the medical evidence.  (Doc. No. 17.)  She maintains that "a simple reading of the evaluation shows that it was filled with inferences and opinions" and "the mere fact that there were also some objective findings does not convert the whole document to objective evidence like an MRI."  (*Id.* at p. 2.)

16

The Sixth Circuit has found that a functional capacity evaluation (such as the Whole Body Assessment herein) may constitute a medical opinion where it is reviewed and adopted by a claimant's physician.  *See Hargett v. Comm'r of Soc. Sec.*, 964 F.3d 546, 553 (6th Cir. 2020).  Here, it is undisputed that Dr. Hopkins expressly adopted the results of the Whole Body Assessment.  (Tr. 1258-1259.)  Thus, the Court considers both the Whole Body Assessment and Dr. Hopkins' September 8, 2020 opinion to be medical opinion evidence.

On January 18, 2017, the SSA amended the rules for evaluating medical opinions for claims filed after March 27, 2017.  *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017).  The new regulations provide that the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)."[7] 20 C.F.R. § 404.1520c(a).  Instead, the new regulations direct the ALJ to evaluate the persuasiveness of each medical opinion by considering the five following factors: (1) supportability; (2) consistency; (3) relationship with the plaintiff;[8] (4) specialization; and (5) any other factor "that tend[s] to support or contradict a medical opinion or prior administrative medical finding."  20 C.F.R. § 404.1520c(c).  Because the regulations consider supportability and consistency the "most important factors," ALJs are obligated to "explain how [they] considered the supportability and consistency factors for a medical source's medical opinions," while they "may, but

---

[7] The "treating source rule," which generally required the ALJ to defer to the opinions of treating physicians, was abrogated by 20 C.F.R. § 404.1520c for claims filed on or after March 27, 2017, such as here.

[8] This includes consideration of the length of the treatment relationship, the frequency of examinations, the purpose of the treatment relationship, the extent of the treatment relationship, and the examining relationship. 20 C.F.R. 404.1520c(c)(3)(i) through (v).

are not required to, explain how [they] considered" the remaining factors. 20 C.F.R. § 404.1520c(b)(2).

Although these regulations are less demanding than the former rules governing the evaluation of medical source opinions, "they still require that the ALJ provide a coherent explanation of her reasoning." *Lester v. Saul*, 2020 WL 8093313 at *14 (N.D. Ohio Dec. 11, 2020), *report and recommendation adopted*, 2021 WL 119287 (N.D. Ohio Jan. 13, 2021).  The new regulations "set forth a 'minimum level of articulation' to be provided in determinations and decisions, in order to 'provide sufficient rationale for a reviewing adjudicator or court.'"  *Warren I. v. Comm'r of Soc. Sec.,* 2021 WL 860506 at *8 (N.D.N.Y. Mar. 8, 2021) (quoting 82 Fed. Reg. 5844-01 (2017)).  An "ALJ's failure ... to meet these minimum levels of articulation frustrates [the] court's ability to determine whether [the claimant's] disability determination was supported by substantial evidence." *Vaughn v. Comm'r of Soc. Sec.*, 2021 WL 3056108 at *11 (W.D. Tenn. July 20, 2021).  *See also Childers v. Kijakazi*, 2022 WL 2706150 at * 5 (E.D. Ky. July 12, 2022) ("When the Court is unable to follow the ALJ's logic, error has occurred.")   However, an ALJ need not specifically use the terms "supportability" or "consistency" in her analysis.  *See Hardy v. Comm'r of Soc. Sec.*, 2021 WL 4059310 at *2 (S.D. Ohio Sept. 7, 2021); *Terry Q. v. Comm'r of Soc. Sec.*, 2022 WL 969560 at * 5 (S.D. Ohio March 31, 2022).

Here, at Step Four, the ALJ evaluated Adams' hearing testimony and the medical evidence regarding her physical and mental impairments, including evidence regarding her degenerative disc disease of the cervical, thoracic, and lumbar spine.  (Tr. 27-30.)  Of particular note, the ALJ discussed Adams' complaints of back and neck pain, as well as treatment records documenting tenderness and reduced range of motion in her cervical spine.  (*Id*.)  The ALJ also expressly acknowledged imaging

of Adams' spine, including (1) the September 2018 MRI of Adams' thoracic spine showing degenerative changes with mild canal stenosis most prominent at T9-12; (2) the February 2019 cervical x-rays showing mild disc space narrowing at C5-6 with loss of normal motion with flexion and extension; and (3) the March 2019 MRI of Adams' lumbar spine showing degenerative changes most severe at L5-S1.  (Tr. 28) (citing Tr. 609, 599, and 592-594.)  The ALJ also, however, noted that Adams' treatment records frequently contained normal findings, including normal reflexes, sensation, strength, and gait.  (Tr. 28-29.)

The ALJ evaluated the Whole Body Assessment, and Dr. Hopkins' adoption of the same, as follows:

> The claimant had a functional whole body evaluation with Michelle Godek, Ph.D. and Jamie Hart, P.T. (12F). The results showed that the claimant could perform medium work with lifting 22.5 pounds during desk and chair activity (12F/2). The examiners recommended that the claimant lift such weight on an occasional basis (12F/2). The examiner[s] determined that the claimant could work four to five hours per day, sit for twenty minutes at a time for one to two hours in a day, and stand for twenty-five minutes at a time for one to two hours in a workday (12F/3). The examiners also stated that the claimant could walk four to five hours per day for long distances (12F/3). Additionally, the claimant was found to be able to occasionally balance, stoop, climb stairs, kneel, squat, crawl, and crouch (12F/3). Dr. Godek and Ms. Hart also noted that the claimant could frequently grasp on the right and occasionally on the left (12F/3).
>
> **The undersigned finds the conclusions of the functional whole body evaluation unpersuasive. While the conclusions were based on the functional whole body findings, the balance of the treatment examinations do not support a finding that claimant was subject to such substantial limitations. While she had ongoing neck pain and limited motion, she exhibited generally normal strength, sensation, reflexes, and gait. Additionally, she had generally mechanical symptoms only and she had conservative treatment.** Nevertheless, in consideration of the claimant's ongoing spinal symptoms and her whole body assessment findings, the evidence supports a finding that the claimant was limited to standing and walking for no more than four hours in a workday.
>
> Dr. Hopkins offered an[] assessment in 2020 where he said that he agreed with the functional capacity assessment and he adopted the results (15F/2). Dr. Hopkins stated that the claimant was unable to perform any full-time occupations and would require

> additional breaks that would make her off task in excess of fifteen percent of the
> workday (15F/2). Dr. Hopkins concluded that the claimant would be absent from work
> at least two days per month (15F/3). **The undersigned finds Dr. Hopkins' opinion**
> **unpersuasive. As described above, the functional whole body assessment findings**
> **were inconsistent with the balance of the evidence**. Additionally, Dr. Hopkins did
> not provide specific explanations of what facts and findings supported the conclusions
> that the claimant would be off task and miss work frequently. Finally, the
> determination of the ability to work is reserved to the Commissioner.

(Tr. 31) (emphasis added).  The ALJ set forth the following RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant
> has the residual functional capacity to perform light work as defined in 20 CFR
> 404.1567(b)[9] except: She can stand or walk for four hours in an eight hour workday,
> but must be permitted to alternate between seated and standing positions at intervals
> of thirty minutes or greater while remaining at the work station and on task.  She can
> occasionally reach overhead with her bilateral upper extremities, and can frequently
> reach in other directions. She can frequently climb ramps or stairs, but can never climb
> ladders, ropes, or scaffolds. She can frequently stoop, kneel, crouch, or crawl. She can
> work in a setting with no more than frequent exposure to poor ventilation or pulmonary
> irritants such as fumes, odors, dusts, or gases. She must avoid all exposure to
> workplace hazards such as unprotected heights and moving mechanical parts. She can
> adapt to no more than frequent changes in the work setting or routine.

(Tr. 27.)

The Court finds that the ALJ sufficiently articulated her reasons for rejecting the majority of

the limitations[10] set forth in the Whole Body Assessment.  As set forth above, the ALJ acknowledged

the Whole Body Assessment but found that its proposed limitations were unpersuasive because they

were not supported by the "balance of the treatment examinations." (Tr. 31.)  Specifically, the ALJ

explained that "[w]hile [Adams] had ongoing neck pain and limited motion, she exhibited generally

---

[9] "Light work" is defined as follows: "Light work involves lifting no more than 20 pounds at a time with frequent lifting
or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category
when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and
pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have
the ability to do substantially all of these activities."  20 C.F.R. § 404.1567(b).

[10] As noted in the decision, the ALJ accepted the Assessment's conclusion that Adams was limited to standing and walking
for no more than four hours per day, and incorporated that limitation into the RFC.  (Tr. 27, 31.)

normal strength, sensation, reflexes, and gait" and had only undergone conservative treatment.  (*Id*.)
Earlier in the decision, the ALJ cited numerous treatment records documenting Adams' many normal
physical examination findings.  (Tr. 28-29) (citing Tr. 357, 755,760, 799, 912, 1007.)  The ALJ also
discussed imaging of Adams' thoracic and cervical spines which showed mild degenerative changes.
(Tr. 28) (citing Tr. 609, 599.)  Lastly, the ALJ cited evidence that Adams' treatment for her back pain
had consisted of injections, medial branch blocks, RFA, and physical therapy.  (Tr. 28-29.)

The ALJ's reasons are supported by substantial evidence.  As discussed at length above, many
of Adams' treatment records document largely normal physical examination findings, including
normal gait, negative straight leg raise, normal reflexes, normal lower extremity muscle strength and
tone, no palpable muscle spasms, absent focal sensory deficits, absent nerve root tension signs,
normal coordination, no lower extremity numbness, and normal flexion and extension of the lumbar
spine.  (Tr. 464, 447-448, 429-430, 424, 367, 357, 361, 353, 344, 328, 303, 779, 760, 755, 749, 742,
799, 836, 899, 1007-1008.)  Moreover, as the ALJ correctly notes, imaging of Adams' thoracic and
cervical spines showed mild degenerative changes.  *See* Tr. 609 (September 2018 thoracic MRI
showed "degenerative changes of the lower thoracic spine with mild canal stenosis most prominent
at T9-T12"); Tr. 598-599 (February 2019 cervical x-rays showed mild disc space narrowing at
C5/C6); Tr. 596-597 (February 2019 cervical MRI showed "no significant abnormality of the cervical
spine"); Tr. 549 (June 2019 cervical x-rays showed no abnormalities). And it is undisputed that
treatment of Adams' neck and back pain was limited to injections, medial branch blocks, and RFA,

21

which are generally considered to be conservative forms of treatment for back and neck pain.[11]  (Tr.

455, 440-442, 430, 368-373, 367, 355-359, 326-331, 757-762, 740, 933-941.)

It is true that Adams also displayed abnormal physical examination findings as well.  These

findings largely consisted of "painful arc of motion in Adams' neck in flexion and extension;"

tenderness over her bilateral cervical paraspinal muscles; decreased cervical flexion, extension, and

rotation; and, occasionally, diminished sensation and reflexes.  (Tr. 328, 353, 303, 760, 742, 799,

836, 899, 742, 424, 434-435, 454.)  And it is also true that imaging of Adams' lumbar spine showed

moderate to severe degenerative findings at L5-S1.  (Tr. 594.)  However, the fact that there is some

evidence in the record to support a finding of disability is insufficient to warrant remand.  Rather,

Adams must demonstrate that there is not substantial evidence in the record to support the ALJ's

conclusion.  *See, Greene ex rel. Greene v. Astrue*, 2010 WL 5021033 at * 4 (N.D. Ohio Dec. 3, 2010)

(noting that "a claimant does not establish a lack of substantial evidence by pointing to evidence of

record that supports her position.")

Here, upon careful review of the record, the Court finds that substantial evidence in the record

supports the ALJ's conclusion that the Whole Body Assessment is not supported by, or consistent

with, the medical evidence as a whole.  Having so found, the Court likewise concludes that the ALJ

properly rejected Dr. Hopkins' September 8, 2020 opinion adopting the results of the Whole Body

---

[11] Courts have consistently found that injections, RFA, and physical therapy represent a relatively conservative course of treatment, which ALJs may properly take into account when fashioning the RFC.  *See, e.g., Lorenz v. Berryhill*, 2020 WL 1818047 at *6 (E.D. Mich. Jan. 24, 2020) (noting that injections, medications, and physical therapy represent a conservative course of treatment) (collecting cases); *Weidman v. Comm'r of Soc. Sec*., 2018 WL 4473368 at *9 (N.D. Ohio May 29, 2018) (noting that nerve blocks, epidural injections, medications, and home exercise are properly characterized as conservative treatments), *report and recommendation adopted by* 2018 WL 3913688 (Aug. 16, 2018); *Bell v. Berryhill*, 2018 WL 3031088 at * 4 (E.D. Mich. June 19, 2018) (noting that courts have consistently characterized RFA as a "conservative treatment plan").

Assessment.  (Tr. 1258-1259.)  As noted above, the ALJ rejected Dr. Hopkins' opinion regarding the Assessment because "the functional whole body assessment findings were inconsistent with the balance of the evidence."  (Tr. 31.) This conclusion is supported by substantial evidence for all the reasons set forth above.

The Court also rejects Adams' argument that the ALJ erred in discounting the Whole Body Assessment because it constitutes objective evidence which the ALJ was not qualified to reject.  It is true that, in the ERISA long term disability insurance context, the Sixth Circuit has found that a Whole Body Assessment (also known as a Functional Capacity Evaluation) ("FCE") "is generally a 'reliable and objective method of gauging the extent one can complete work-related tasks.'"  *Caesar v. Hartford Life and Acc. Ins. Co*., 464 Fed. Appx. 431, 435 (6th Cir. 2012) (quoting *Huffaker v. Metro. Life Ins. Co*., 271 Fed. Appx. 493, 500 (6th Cir. 2008)).  *See also Brooking v. Hartford Life & Accident Ins. Co.,* 167 Fed. Appx. 544, 549 (6th Cir. 2006) (describing an FCE as "objective evidence" of the claimant's back pain).  In those cases, the Sixth Circuit determined that "the rejection of [an] FCE without a reasoned explanation" may constitute reversible error.  *Caesar*, 464 Fed. Appx. at 435.

In the social security context, however, federal courts have found that an ALJ may reject limitations in an FCE so long as the ALJ adequately explains her reasons for doing so and those reasons are supported by substantial evidence.  Specifically, courts in this District have upheld ALJ decisions rejecting limitations contained in an FCE as "inconsistent with, and not supported by, medical evidence in the record, citing specific evidence in support."  *Klapp v. Comm'r of Soc. Sec.,* 2022 WL 310228 at * 20 (N.D. Ohio Feb. 2, 2022).  *See also Fair v. Comm'r of Soc. Sec.*, 2022 WL

1802977 at * 6 (N.D. Ohio June 2, 2022); *King v. Saul,* 2020 WL 1025170 at * 9-10 (N.D. Ohio March 3, 2020); *Mullett v. Berryhill*, 2019 WL 551446 at * 11 (N.D. Ohio Feb. 12, 2019).[12]

As set forth in detail *supra,* the ALJ herein articulated a reasoned explanation for rejecting the Whole Body Assessment and provided specific citations to the record earlier in the decision to support that conclusion.  Moreover, as set forth above, the Court finds that the ALJ's stated reasons for rejecting the limitations in the Assessment are supported by substantial evidence.

Accordingly, Adams' first Objection is without merit and overruled.

**B.    Evaluation of Dr. Hopkins' Opinions**

In her second Objection, Adams argues that the Magistrate Judge erred in concluding that the ALJ sufficiently supported her reasons for rejecting Dr. Hopkins' opinions.  (Doc. No. 16 at pp. 3-4.)   Adams argues that remand is required because the ALJ "used generic claims [of normal examination findings] and did not use specific references, dates, findings, or examples." (*Id*.)  Adams maintains that the ALJ's recitation of the medical record earlier in the decision is insufficient to allow the Court to understand why the ALJ rejected Dr. Hopkins' opinions of Adams' specific functional limitations.  (*Id*.)  Because the ALJ failed to properly identify the specific evidence supporting her conclusions, Adams argues that the ALJ's rejection of Dr. Hopkins' opinions is not supported by substantial evidence.  (*Id.*)  The Commissioner disagrees, arguing that the Magistrate Judge properly

---

[12] Moreover, at least one court in this District has rejected the argument that an ALJ must accept a FCE because it constitutes "objective evidence," finding instead that an ALJ may reject a FCE where there is substantial evidence in the record that contradicts it.  *See Thompson v. Comm'r of Soc. Sec*., 2020 WL 3410350 at fn 5 (S.D. Ohio June 22, 2020) ("Plaintiff cites *Shaw v. AT &T Umbrella Ben. Plan No. 1,* a case involving disability benefits under ERISA, for the proposition that the functional capacities evaluation constitutes 'objective evidence' to support her claim. *Shaw* does not aid Plaintiff in this case, because the ALJ's analysis was supported by other substantial (and equally 'objective') evidence that Plaintiff was not limited to sedentary work."), *report and recommendation adopted by*, 2022 WL 178512 (Jan. 20, 2022).

evaluated the ALJ decision as a whole in determining that the rejection of Dr. Hopkins' opinions is supported by substantial evidence.  (Doc. No. 17 at p. 2.)

As discussed *supra*, at Step Four, the ALJ recited the medical evidence regarding Adams' neck and back pain in some detail, with citation to specific imaging results, physical examination findings, and treatment records.  (Tr. 28-29.)  The ALJ then evaluated Dr. Hopkins' three opinions as follows:

> Kevin Hopkins, M.D. stated that the claimant could lift and carry less than ten pounds, stand and/or walk for at least two hours, and sit for less than six hours in a workday (8F/2). Dr. Hopkins opined that the claimant could frequently crawl and climb ramps or stairs, with no other postural limitations (8F/3). Dr. Hopkins asserted that the claimant had an unspecified limitation reaching in all directions (8F/4). The undersigned finds this opinion unpersuasive. While Dr. Hopkins treated the claimant, neither his records nor the medical records as a whole contain objective findings or testing to support a conclusion that claimant's impairments would limit her to sedentary levels of lifting, standing, or walking. Despite chronic neck pain, she demonstrated largely normal strength, sensation, reflexes and gait, with imagery showing relatively mild impairments, all more consistent with a finding that she could generally perform light work.
>
> Dr. Hopkins offered another assessment of the claimant's functioning, indicating that she had nerve root compression, limited motion, muscle weakness, and neuro-anatomic distribution of pain (9F/1). Dr. Hopkins asserted that the claimant would be off task for over fifteen percent of the workday due to breaks and interference with concentration, and unable to sit or stand for more than thirty minutes at a time (9F/2). The undersigned finds such opinion unpersuasive. While lumbar imagery did show a bulging disc with stenosis, the record as a whole documented generally normal gait and strength, and the treatments sought by claimant to manage her pain focused most significantly on her cervical and thoracic spine, where imagery contained more minimal findings like mild or minimal narrowing, small osteophytes, very minor subluxation, and mild stenosis. The objective findings and associated treatments in the record as a whole do not support a finding that the claimant could sit and stand for only short periods, nor do they suggest severe pain consistent with the off task limitations contained in the opinion.
>
> ***
>
> Dr. Hopkins offered another assessment in 2020 where he said that he agreed with the functional capacity assessment and he adopted the results (15F/2). Dr. Hopkins stated

25

that the claimant was unable to perform any full-time occupations and would require additional breaks that would make her off task in excess of fifteen percent of the workday (15F/2). Dr. Hopkins concluded that the claimant would be absent from work at least two days per month (15F/3). The undersigned finds Dr. Hopkins' opinion unpersuasive. As described above, the functional whole body assessment findings were inconsistent with the balance of the evidence. Additionally, Dr. Hopkins did not provide specific explanations of what facts and findings supported the conclusions that the claimant would be off task and miss work frequently. Finally, the determination of the ability to work is reserved to the Commissioner.

(Tr. 30, 31.)

As an initial matter, the Court finds that the ALJ sufficiently articulated her reasons for discounting Dr. Hopkins' three opinions. With respect to each opinion, the ALJ explained that she found that Dr. Hopkins' opinions of substantial physical limitations were not supported either by his own treatment notes or by the medical record as a whole. (Tr. 30, 31.) In support of this conclusion, the ALJ cited Adams' largely physical examination findings, including normal gait and strength. (*Id.*) As discussed at length above, the ALJ's reasons are supported by substantial evidence in the record.[13]

The Court rejects Adams' argument that remand is nonetheless required because the ALJ did not specifically cite any particular treatment notes in the paragraphs of the decision relating to Dr. Hopkins' opinions. It is well-established that courts may review an ALJ decision as a whole in determining whether it is supported by substantial evidence. *See, e..g, Alec F. v. Comm'r of Soc. Sec.*, 2022 WL 278307 at * 12 (S.D. Ohio Jan. 31, 2022) (finding that "the ALJ's decision as a whole is sufficient to permit this Court's review of the ALJ's evaluation of supportability and consistency."),

---

[13] The Court notes, in particular, that substantial evidence supports the ALJ's finding that Dr. Hopkins' opinions are not supported by his own treatment records. In his August 24, 2018 treatment note, Dr. Hopkins indicates all normal physical examination findings aside from "higher muscle tone" in T6, 7, 8. (Tr. 470.) He also notes that Adams reported "feeling great overall" at that time. (Tr. 469.) There are no abnormal physical examination findings in Dr. Hopkins' February 12, 2019 treatment note and, indeed, he notes "no cervical or spinal tenderness" and normal upper extremity muscle strength. (Tr. 437.) No abnormal physical examination findings are noted in Dr. Hopkins' March 29, 2019 treatment note. (Tr. 377.) Lastly, in his February 13, 2020 treatment note, Dr. Hopkins found limited cervical range of motion, but "no gait abnormalities, no other gross abnormalities" and normal upper extremity muscle strength. (Tr. 899.)

*report and recommendation adopted by* 2022 WL 884022 (S.D. Ohio March 24, 2022); *Cormany v. Comm'r of Soc. Sec.*, 2022 WL 4115232 at * 6 (N.D. Ohio Sept. 9, 2022) ("In sum, the ALJ's decision, read as a whole, demonstrates that he considered the factors of supportability and consistency in evaluating Dr. Iler's August 2019 opinion.")  Here, earlier in the decision, the ALJ cited numerous specific treatment records documenting normal physical examination findings, including normal gait, strength, sensation and reflexes.  The fact that she did not reproduce these pinpoint citations a second time when she explained why Dr. Hopkins' opinion was not supported by the medical record is not grounds for remand.  *See Crum v. Comm'r of Soc. Sec.,* 660 Fed. Appx. 449, 457 (6th Cir. 2016) ("No doubt, the ALJ did not reproduce the list of these treatment records a second time when she explained why Dr. Bell's opinion was inconsistent with this record.  But it suffices that she listed them elsewhere in her opinion.") (citing *Forrest v. Comm'r of Soc. Sec.*, 591 Fed. Appx. 359, 366 (6th Cir. 2014)).

Accordingly, the Court finds that Adams' second Objection is without merit and overruled.

### C.    Adequate Review of the Record

Lastly, Adams argues that remand is required because "the ALJ's review of relevant facts whitewashed the actual evidence in the record."  (Doc. No. 16 at p. 4.)  Adams maintains that the "record is filled with abnormal results which the ALJ did not adequately document or reference." (*Id*.)  More specifically, Adams argues that the ALJ only cited three treatment notes with abnormal findings when there are, in fact, twenty-two treatment notes with abnormal findings.  (*Id.* at p. 5.) She also asserts that the ALJ "omitted findings of severe stenosis in the 2019 lumbar MRI and completely failed to review the Thoracic and Cervical MRI tests that noted abnormal relevant findings."  (*Id*. at p. 6.)  While Adams acknowledges that an ALJ is not required to reference every piece of evidence, she maintains that "a decision cannot distort the record and ignore favorable

evidence." (*Id*.)  The Commissioner argues that the ALJ properly characterized the medical record and did, in fact, acknowledge Adams' abnormal physical examination findings and imaging.  (Doc. No. 17 at pp. 2-3.)

It is well-established that an ALJ is not required to discuss every single piece of evidence to support his or her decision.  *See, e.g., Thacker v. Comm'r of Soc. Sec.,* 2004 WL 1153680 at * 3 (6th Cir. May 21, 2004).  The ALJ is, however, required to *consider* all the relevant evidence in the record in assessing a claimant's residual functional capacity ("RFC").  *See Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 378 (6th Cir. 2013) (finding that "an ALJ must consider all relevant evidence in the case record"); *Hurst v. Secy'y of H.H.S*., 753 F.2d 517, 519 (6th Cir. 1985) ("Failure to consider the record as a whole undermines the Secretary's conclusion"); *Adkins v. Comm'r of Soc. Sec*., 2019 WL 1040943 at * 3 (N.D. Ohio Mar. 5, 2019) (same).  Moreover, an ALJ must provide a discussion at each step of the sequential evaluation "in a manner that permits meaningful review of the decision." *Boose v. Comm'r of Soc. Sec.*, 2017 WL 3405700 at *7 (N.D. Ohio June 30, 2017) (quoting *Snyder v. Comm'r of Soc. Sec.*, 2014 WL 6687227 at *10 (N.D. Ohio Nov. 26, 2014)), *report and recommendation adopted by* 2017 WL 3394756 (N.D. Ohio Aug. 8, 2017).

Here, the Court has carefully and thoroughly reviewed the medical evidence cited by the parties in this case.  While the ALJ did not specifically reference each and every abnormal physical examination finding in the record, it is clear from a review of the decision as a whole that the ALJ fully considered the medical evidence regarding Adams' chronic neck and back pain.  The Court also notes that the ALJ did, in fact, expressly reference and discuss Adams' September 2019 thoracic MRI; February 2019 cervical MRI; and March 2019 lumbar MRI.  *See* Tr. 28 (citing Tr. 609, 599, 594) and Tr. 30 (discussing lumbar imagery showing a bulging disc with stenosis, as well as cervical

28

and thoracic imaging showing "more minimal findings like mild or minimal narrowing, small ostephytes, very minor subluxation, and mild stenosis").  Upon review of the medical record, however, the ALJ concluded that "objective findings and associated treatments in the record as a whole do not support a finding that the claimant could sit and stand for only short periods, nor do they suggest severe pain consistent with the off task limitations contained in [Dr. Hopkins'] opinion." (Tr. 30.)  As discussed at length *supra*, the ALJ's findings are supported by substantial evidence in the record.

Although Adams cites evidence from the record that she believes supports a more restrictive RFC, the findings of the ALJ "are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001).  Indeed, the Sixth Circuit has made clear that an ALJ' s decision "cannot be overturned if substantial evidence supports the claimant 's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec*., 336 F.3d 469, 477 (6th Cir. 2003). In the instant case, the ALJ clearly articulated her reasons for finding Adams capable of performing work as set forth in the RFC and these reasons are supported by substantial evidence.

Accordingly, Adams' third, and final, Objection is without merit and overruled.

## V.    Conclusion

For all of the foregoing reasons, Plaintiff's Objections are OVERRULED.  The Court

ADOPTS the Magistrate Judge's Report and Recommendation, and the Commissioner's decision is

AFFIRMED.

**IT IS SO ORDERED.**


                                    *s/Pamela A. Barker*

                                    PAMELA A. BARKER

Date:  March 3, 2023                  U. S. DISTRICT JUDGE